ROCHE DIAGNOSTICS v. LIFESCAN The last aspect first. The experts' testimony, both LIFESCAN's expert, Dr. Williams, and NOVA's expert, Dr. Higson, testified that a 1,000-micron electrode would exhibit purely macroelectrode-type behavior and would be experiencing planar diffusion overwhelmingly. And that is at Appendix Site 1958. LIFESCAN's expert, Dr. Williams, testified that the non-planar diffusion with electrodes of that size would be insignificant and undetectable. And that's at Appendix 1949. And it would not be observable in any experiment. Again, that's at Appendix 1947. Did they happen to have testified as to the point at which non-planar diffusion becomes no longer a substantial portion of the diffusion? No, I don't believe they did. I don't think that was an issue. It wasn't an issue. It's a pretty important issue now. Well, all along, throughout the litigation, Roche took the position that the term electrodes in the claims of these patents covered both macroelectrodes and microelectrodes. I understand. They say not so. But I understand your point on that. But certainly, at this point, and presumably at the point that they went back to the motion of reconsideration to Judge Farnan, that was no longer their argument. So assuming we're not going to hold them to the position they initially took, then that raises the question of how do we get at this definition of microelectrode? Do we limit it to 100? Do we say that it's limited to either 100 or something that continues to show predominantly non-planar diffusion? If the latter, then it's pretty important that we know, well, when does that happen? And what you're telling us is there's nothing in the record that tells us that. Well, there is a further teaching in the specification. And I would ask the court to look at Column 15, lines 55 through 65, where it teaches you how to achieve the desired non-planar diffusion. And it does that by limiting the size of the electrodes to a range of 5 to 50 microns, most preferably 10 to 50 microns. So when you take that in conjunction with the teaching in Column 4, what you glean from that is that the upper limit of 100 microns, quite frankly, is overgenerous. And I do want to address another issue that was raised by Roche's counsel, which is the term microelectrode at the time the provisional application was filed in 2001 did not have a plain and ordinary meaning. The first time Roche argues that is now on appeal. And in fact, if you look at the very extrinsic evidence to which they referred the court, this Bard and Faulkner treaties at footnote 1, appendix site 1047, it shows, in fact, that the term microelectrode did not have a defined size in the art. In fact, it was always changing. As everything does in the electronics fields, everything gets smaller. So what did the inventor do? To make certain people knew what his microelectrode invention was, he placed an upper limit on the size of the electrodes to be 100. He was clearly aware of these larger electrodes that were in his Excalibur report that is dated in 1997. He was clearly aware of those when he filed his provisional application in 2001. And he decided to describe his invention as a microelectrode invention having an upper limit of 100 microns. He did not take into consideration these larger electrodes that were in the Excalibur report. Instead, he put an upper limit on it. And it wasn't until 2002, when Roche filed one of the applications leading to these patents ensued, that they added these later examples, these examples three through five. And they did that for the specific purpose to get a broad construction of the term electrode to cover LifeScan's commercial product that had come on the market that had macroelectrodes. And they maintained that construction, that electrode meant micro and macro, all the way up through the litigation using examples three to five to support it. And it wasn't until that Judge Farnan found against them that they reversed their position and came back and said, no, these undisputedly macro electrodes are now microelectrodes. Did I hear you say that in the provisional application, they limited themselves to 100? Just a minute ago, is that what you said? No, I said, well, I did, because that forms the basis of the common specification, which gives you The provisional application had greater than 15. There was no limit. That was the claims in the provisional application did that. That's correct. But I mean that the Well, then how do you, you went kind of fast in your talking. And I thought you were telling me that the inventor had limited himself in the provisional application to 100 microns of width. He did, because it's the common specimen. He didn't. Because claim one says just a width greater than 15. That's assuming that there's some claim differentiation that you can reach between those. But the provisional, he didn't even have to have claims in his provisional application. He called them microelectrodes. He didn't have these larger sized electrodes in there. There's no disclosure anywhere in the specification of microelectrodes being as large as 1,000. And I see I'm out of my time. Other than example of six, or example, pardon me, three, right? Examples three to five. Yeah. Which are only in one of the patterns. And why is it that we throw those, as Farnan did, we throw those three exhibits out? Why? Number one, they're macroelectrodes, as Roche told the district court. As the inventor testified. You haven't responded to his argument. He said, yes. We said, if you buy Nova's claim construction, if you buy their claim construction, then of course the examples are macro. Because you said micro is limited to 100. So that's the complete answer which you have to address to your, oh, well, they confessed that the exhibits are macros, and said that we said that in comparison to your claim construction argument. They took a consistent position that the term electrode covered both macro and micro electrodes, and they used for support examples three to five. They only, and they told the district court, the inventor testified, and the inventor's testimony is at appendix site 21-144. The inventor testified in this case that examples three through five were macroelectrodes. It wasn't until their position was rejected that what were undisputably macroelectrodes now became magically microelectrodes. And Roche's response to that is that we generally discount inventor testimony, right? The other point I'd like to make. Isn't that, what's your response to that? It's true that the inventor said that exhibits three to five were macro. And he probably wasn't saying that in response to your claim construction. But we do have case law that says, well, believe it or not, we really don't care what inventors think they invented. Well, I think it's consistent with what he did when he filed his provisional application. And he called it a microelectrode invention. And he did not include those examples in his originally filed application. It wasn't only until later. But his provisional application had no, in its independent claim, had no limit whatsoever. Presumably could have gone from 15 to whatever. Those aren't the claims that happen to be construed in the patents that suit right now. The claims are different than that right now. Those are no longer. I understand that. But there's a lot of argument in this case that we're supposed to trace back to the provisional so we can really see what's going on here. I would submit that the provisional application is limited to microelectrodes and that the fact that there was begs the question of what the maximum dimension of a microelectrode is. That was the presiding judge's question from the get go. But that's been my point. That's why they put the upper limit of 100 on it. Because the claim term did not have a plain and unambiguous meaning in the art. The extrinsic evidence that Roche itself relies on shows that it didn't. That's why he placed the upper limit of 100 there. And if you read the specification consistently from column 3 to column 4 to column 15 and throughout, there is no disclosure anywhere in that specification of electrodes having a larger size than 100 all the way up to 1,000. With the exception of the added examples. This is a three exhibit case. And they are only in one of the patents, not the other patent. Is that . . . What do we make of that? What do we make of that? Because . . . You don't want to win half this case, I take it. What I would submit is that the claim terms, common claim terms in related applications as this court is so held should be construed consistently. Well, that doesn't tell us which way to construe the claim. Whether we construe the 147 that's contained in the same or the 146 as the 147. The other point about these added examples is they can only find support for this macro electrode from these added examples which came in in 2002. And it's undisputed that LifeScan's commercial product was on the market more than a year before those examples were added so that they would have anticipatory art against those claims. One other point I'd like to make on examples 3 to 5 and then I'm going to sit down, is that the Patent Office also found that those examples could not support an invention date of 1997 because they weren't used with blood. And that is at appendix site 1023 in 1297 to 98. Before you sit down, if we could stop the clock from running for a moment. I just wanted to clarify one point for housekeeping purposes. You have designated in your brief, I believe it's your, yes it is your brief, various materials as confidential including some of the materials that you've discussed here in particular the inventor's testimony. You, I take it the parties do not have any problem with our reference to the referencing the inventor's testimony in any discussion or opinion that may come? I mean, sometimes these confidentiality references are vestigial in that they may have been part of an agreement that was reached early on but no longer has effect. Can the two parties or three parties if necessary let us know now preferably or later if need be whether you have any continuing interest in maintaining confidentiality with respect to any of the materials in the red brief? Certainly we can. My understanding is it's all Roche confidential information. The inventor testimony to which I cited here I believe had been de-designated but I will have to check that. It's designated, I paid attention to this because when I was reading the brief I was thinking how are we going to talk about this. You saved us that trouble by being the first to mention the inventor testimony but I just, maybe Roche can give us the answer to this. You and I take it your co-counsel have no problem with excising the confidentiality requirements? LifeScan certainly doesn't. And Roche I think to the extent it hasn't already waived it will. We will regard the confidentiality designation then as punctus officio. All right, thank you. Now Mr. Jones, how much time is left total for the appellees given the additional time that we granted? Do you have a? Yes sir, we have a total of nine and a half minutes. Nine and a half minutes. And that will include rebuttal. You've saved a couple of minutes for rebuttal. Yes, you're right. Go ahead. I hate to wade into the micro electrode issue because I've got a lot of issues to cover but I did want to respond Judge Clevenger to your question. If I understand your question correctly I think the answer is that examples three to five are unclaimed embodiments because they don't relate to blood. So therefore I don't think it's proper to take those into account when you're construing claims that relate to blood. That would be my answer to that question. I saw your argument on that and perhaps it wasn't yours, perhaps it was life's cancer. But in any event, it struck me that the unclaimed embodiment argument misses the point that is most potentially important about examples three through five. It's not whether they are within the scope of the claims or not. It is what they tell us about the meaning of microelectrode. Because this patent is a patent which is specifically designated as applying to microelectrodes and setting aside Roach's earlier statements before the district court whether they may have been consistent with that notion. If one starts with the proposition that this patent is all about microelectrodes, everything in the patent is about microelectrodes then it's pretty good evidence as to what a microelectrode is that these three examples say electrodes up to 1,000 microns. It seems to me the pertinence of the examples not whether they're claimed or not claimed or enabled or not enabled. They're in the text of the specification. Yeah, I understand that your honor. But there are patents where people throw things in and this was new material. And in fact, I think Ms. Berg touched on this and this kind of touches on our cross appeal and the counterclaims that we asserted. Material was put into the patents in an attempt to broaden out the claims improperly we think to try to capture products in infringement. So that's why it's there but I certainly understand your point. It is there and it's something that the court has to deal with. Okay. Go ahead. So my plan and I know we've been running a long time and so subject to what the court would like me to do I'd like to touch on the alternate grounds for affirmance on the patent side and then head to the cross appeal. So I'll start in but if you'd like me to use my time otherwise just let me know and I'm sure you will. We in our briefing, Roche and I'm sorry that LifeScan didn't deal with this. We think there's another claim construction issue where Judge Farnan got it wrong and that's that the detecting step should include a delay prior to the application of the voltage. And if you take a look at that claim language that's involved in say claim 31 of the 147 it talks about following the detecting step and this is claim 31-146 applying or controlling the voltage and I think that what you can read into that language is that the voltage is applied after following the detection step and the detection step includes a delay and why does the patent teach a delay? The patent teaches a delay to allow the sample to mix with the chemicals before the current is established that can actually measure the glucose concentration. Now how do we know that... What harm would be done if you apply the voltage from the beginning? In terms of what effect would it have on the initiation of the reaction between the glucose and the flexible substrate? Well based on the teachings of the patent it is applied. It's applied initially and then it's stopped and you have this open circuit delay for it to settle down. Okay but why is that something that's important for reasons other than just to save battery time? Well the inventor thought it was important and if you look at the inventor testimony... Help me out here. What is it that in your view makes this something other than just a sort of happenstance feature of the language of the claim? I mean if they claimed it that way and they're stuck with it. So if that's your argument that's fine but if there's more to it than that then I'd like to know what it is. In other words there is a scientific reason that one would want to have a delay but in your system you've overcome that problem. That's what I'm looking for. If you have an answer like that I would like to know what it is. Well my answer to that question is if you give it time to settle down and to get a complete reaction you're perhaps going to get a more accurate number when you reapply the voltage because you've allowed the chemical reaction to take place rather than applying the voltage right through and measuring the current from the beginning. You may have an incomplete mixing of the plug with the chemicals and so when you delay you allow it to settle down. You'll certainly get a different measurement before there's been a complete reaction. But does the application or is there anything in the record that would suggest that applying the voltage from the get-go has the effect of interfering with the reaction? I'll put it that way. I'm not aware of anything to that effect. And just if you take a look at the specification all the examples describe this drop detect and I know that's not the end of the story but if you take a look at the specification in column 7 it talks about amperometric applications and it describes how this applies to amperometry and that's through column 8, line 15 and there it talks about delay. In the summary of the invention they talk about detecting and thereafter applying the voltage. In column 13, line 36 again they talk about delay when they're talking about the invention. So this is throughout and in fact right on the front page of the patent they've got figure 7 and it talks about a delay. It was very clear that delay was thought to be required to conduct this invention in an accurate manner. And in fact they distinguish Your adversary's argument is yes it's preferably achieved but not necessary. So it's a little bit like the size of the electrode argument preferred embodiments, right? All the preferred embodiments here show delay. Well, Your Honor Why should we limit the claim to that? Well, because I think that when they do discuss the delay for example when they're talking about the amperometric application they're not talking about a preferred embodiment. When they're talking about in the summary of the invention they're not talking about the preferred embodiment nor in column 13, line 36 when they talk about the original invention. There's an example of the method involves a catalytic use the idea of an amperometric, right? Well, they say column 7 they say the sensor of the invention may be used in amperometric applications. I'm looking at line 41 and then it talks about the delay if there's short delay time at the column 8, line 14. But I guess the way I read this is that you know if the specification could talk it would say use a delay. And they don't always use it with the preferred embodiment. And I think the other evidence is consistent with that. If you look at the prosecution history they distinguish claims based on the fact that you can't combine amperometry with a delay such as what's disclosed in the patent application with coulometry. So they distinguish that. In fact, Judge Farnan found that to be the case. He found that they had basically distinguished prior art but he didn't take the next step which was to say that they had disclaimed it which I would urge this court to do because to me that's a disclaimer of amperometry that does not have a delay. Whether they needed the delay or not it doesn't impact you know on how these claims should be construed. And then of course there's the inventor testimony and we cite that at 8, 10, 824, 825 where he said you needed a delay. So this is what they thought whether they needed it or not that's what they thought and that's how the patent was drafted and that's how the application was prosecuted. So I'll move on to the cross appeal unless there's questions. Now there's three issues. There's the preclusion of key evidence. That's number one. The choice of law issue and then the denial of the JMOL. I'll start with the preclusion of evidence. I in my opening tried to get into the record that evidence of unfair competition and breach of contract was that Roche had sued our they spurred a patent application. This wills the application was spurred from the technology that we disclosed to them and then we were sued. Our client was sued and had to spend millions of dollars defending the suit. I tried that to get to get that evidence into the record. It was evidence of unfair competition and breach of contract. Roche objected. The objection was sustained. We spoke to Judge Farnon at the end of the day. He said I'm not to bring up the lawsuit the fact of the lawsuit or the result. We move on. Mr. Drutges is cross-examining my client the CEO. He asked him a question about how NOVA has been hurt by this by the wills the application. My client's not allowed to respond. I told my client not to respond about the lawsuit because I've been ordered not to bring it up. I asked for a sidebar. Judge Farnon said well I can't let you respond to that even though Mr. Drutges has opened the door because then I've got to give them a chance to respond. Now that was not an analysis under 402, 403. It was simply a time management issue. That's part of what 403 is about. Yes, yes. Well maybe Your Honor but the door had been opened now to the harm issue. He's basically now told the jury and because we couldn't respond that we've not been harmed by what they've done. So now that's two errors I propose that have been made. And so I wasn't given a chance to respond to that. The jury is thinking we have not been harmed because we can't respond. Then Mr. Drutges in the closing gets up and he says that NOVA initiated the litigation to seek retribution because Roche didn't partner with them. And again, I can't bring up the lawsuit to say they sued us first. We didn't initiate the lawsuit. So now the jury is thinking you are now in this courtroom to seek retribution and you've not been harmed. This I suggest is prejudicial error. Highly prejudicial with the jury. And the standard on appeal is that an error is harmless only if it is highly probable that the error did not affect the outcome. I would suggest that that error did affect the outcome. It's highly probable that it did affect the outcome. It tarnished NOVA's reputation and was just unduly prejudicial. I'd like to move on to the choice of law. NOVA says it went on that, just on that last point, Roche said, well, you didn't object. When NOVA's lawyer asked your client how he was hurt, you didn't object. Well, I asked for a sidebar, Your Honor, and that was effectively an objection. I think we've cited some case law that would suggest that my asking for a sidebar and having a detailed discussion and expressing my objection, even though I didn't use the word object, with Judge Farnan, there was a long dialogue and sidebar about this, that that effectively is an objection. So I believe that I preserved my rights. I resorted twice not to bring up that lawsuit. The choice of law, again, I'm sorry, was there? No, no. Oh, I'm sorry, I thought you had a question. The choice of law, Judge Farnan, because it's a choice of law provision in the NDA, he applied Swiss law to all the claims. We had claims to not just breach of contract, we had unfair competition, misappropriation of trade secrets, and also conversion. He applied the choice of law provision, which was Swiss law, to all of the claims. That knocked out two of our claims and raised the standard of evidence or our standard of proof on the unfair competition claim. Under Delaware law, which was the proper law for him to apply, he should have done an analysis under the restatement, and he has not provided any analysis. He gave his ruling. He decided this on the fourth day of a five-day trial. He didn't provide an analysis for us, and that alone is reversible error. Had he done this analysis under Delaware law, the proper result would have been the application of Swiss law to the contract. So he couldn't, he erred if he relied on the ferocious Swiss law experts' declaration? Yes, yes, he didn't. Actually, the declaration didn't address whether the state law, you know, the procedure for how to approach the choice of law. The procedure should have been... I thought the declaration said because it covers all respects, then the scope of the choice of law provision as to whether it went solely to a contract claim or whether it also covered a tort claim as understood the Swiss law expert to say under Swiss law, you would construe the scope of the agreement to cover both the tort and the contract claims. Well, that was his opinion. There was no... Was that controverted by another Swiss lawyer that you all had? No, no, it wasn't, Your Honor. Then why isn't it okay for Judge Farnan to rely on that? Well, we don't know whether he did or he didn't. You know, we know the result. We don't know the reasoning. We don't know the reasoning. Well, but I mean, we're capable of looking at the record and see if there's something in there to support what he said, right? Well, we can look at briefs, but we can't look at the reasoning. I read the expert to say that the tort claims were swept right in with the contract claims under Swiss law. That's what he said. But he also said that the choice of law provision must be very specific as to what else is swept in. And so, in the record, it was also... Yeah, the Swiss expert said, this is most unusual. He said, you know, we see a lot of these Swiss confidential agreements and they almost never have this in all respects language, so it's very unusual that you would do that. Yeah. And then you have to put yourself into the minds of the parties in this most unusual situation to see what they meant to sweep in. Well, there's actually Delaware law on this issue, though, Your Honor, and it addresses... On construing Swiss contracts? No, no, not on how to interpret Swiss contracts, but basically on how to deal with choice of law provisions. That's the law that should have governed how you deal with choice of law provision. Now, the Swiss expert we established on cross-examination, he was a member of a firm that actually did work for Roche. He was, I would say, something less than a completely unbiased witness, and we established that on cross-examination. So... But he did say that the choice of law provision must be very, very specific as to what else it sweeps in. And here it spoke about the agreement in all respects. And if you look at that language under Delaware law, it applies the restatement. Yes, that applies to the contract and claims that derive solely from the contract. But as to torts, it does not apply, and Delaware law would require that the restatement apply and apply the most significant relationship test, which is Massachusetts law. So... We think that the court erred on that, and that, you know, that is a basis for reversing and remanding this case to the district court. I think the remainder of your argument on cross-appeal I think we have in the briefs sufficiently. I think we probably better move on in order to save you a couple of minutes. Okay, that's right. Great, thank you. Um... Let's see. The appellant's rebuttal. Yeah, a couple things. One, a correction of something I stated. The Bard and Faulkner electrochemical methods textbook was actually an evidence in Markman. What was new was the expert's testimony admissions that the texts were a leading text and was, in fact, something that they used in teaching their own students. Their testimony, for instance, Dr. Higson's NOVA's expert's testimony that a 1,000-micron electrode would, in fact, have a degree of non-planar diffusion, and his testimony regarding Musho and how that was a compelling reference, even though it had microelectrodes of substantially over 100 microns in width. What exactly was the testimony of the expert with respect to the degree of non-planar diffusion? Because I think everybody seems to be in agreement that there is some, at least minimal degree of non-planar diffusion, even at 1,000 microns. What did he say in particular as to the degree? Because the language in the specification is something along the line of predominantly non-planar. Well, I come back to that, Your Honor. That was one of the things I was going to address. First of all, the only reference to predominantly non... Well, yes, yes, but first answer the question, if you would, as to what the expert said, and then we can work from there to what the text of the specs is. First of all, I think Dr. Hickson didn't try to put any kind of percentage on it. He just said some? Was that his language? Yes, he said that there would be some. And Dr. Williams, LifeScan's expert, didn't provide any kind of tests or anything like that that would establish any kind of percentage of non-planar versus planar diffusion at the 1,000 micron limit either. But coming back to this issue of the substantially non-planar, I think you're referring to the third paragraph of the detailed description section again. Sure, and I understand your argument that that's a preferred embodiment and so forth, but that's a preferred definition, not an exclusive definition, but it is certainly as close as we get anywhere in the specification to an effort to specify what we're talking about in reference to microelectrodes. So it's pretty important, it seems to me, to the analysis of the case. Well, it may be, but the sentence starts out with saying a mix of planar and non-planar diffusion. Any mix of planar and non-planar diffusion can be a microelectrode. And there's absolutely no question, I think, no dispute that the term especially modifies that substantially planar reference in that last sentence. I understand the dispute, life-scale disputes, as to whether it modifies the last if phrase, but there can be no dispute that it modifies the first if phrase. And so I think that any kind of substantially planar, substantially non-planar diffusion reference is clearly a preferred embodiment. Well, the sentence that gives me some trouble with respect to your position is actually the sentence that says non-microelectrodes, i.e. macroelectrodes, cause diffusion of an analyte through a solute according to a substantially planar path. So that suggests that if you have a path which is minimally non-planar but substantially planar, then you've got a macroelectrode. That seems to me to be a problem that, and the question then is does your expert somehow cure that problem? I would agree with you, Your Honor, if the applicant didn't go on and broaden the definition of a microelectrode by stating that any mix of planar and non-planar paths can also be considered a microelectrode. Well, that would seem to be inconsistent with the sentence I just read. Well, inconsistent or clearly broader. Clearly an intent to broaden the scope of a microelectrode. Well, if it's clearly broader, then it's inconsistent. And that may be correct, but certainly I think based on one sentence in the middle of this paragraph, I don't think it's fair to address or assert that that in and of itself would be a basis for imposing a limitation on claims, especially when there's a contradictory sentence that states a much broader definition, if there is a definition at all in this paragraph, of a mix of planar and non-planar paths. Furthermore, the claims of the provisional application, as you pointed out, Judge Clevenger, claim one has no upper limit of 100 microns, and it's only when you get to claim two which would impose such an upper limit. And in fact, the proposed construction that was proposed by defendants would effectively limit the scope of these claims to something narrower than claim one of the provisional application. And I assert that that would be an error based, again, on the intrinsic evidence and something that would be under section 112, part of the original disclosure. What about the fact that the examples three through five came into this prosecution late? In 2002, I guess it was, after there was already LifeScan's product, I guess, was already in there. What use can we make of those examples in light of that fact? Well, I point out that in this court's Martek decision, the court relied upon just that example in connection with just that kind of intrinsic evidence, whether it's part of the specification or the prosecution history, to establish that the claims could not be construed more narrowly. Second of all, let's go back to first principles. I mean, suppose I've written a patent application that's clearly, I haven't been very specific, but the better reading of my application would be that it's limited, let's just use these facts for convenience, to 100 microns. And I say, uh-oh, I see that my competitor's got something at 750 microns. I'd better find some way to fix this. And so I go to my patent lawyer, and I say, what can I do? And he says, well, I've got an idea. We'll add some examples to the specification. We'll call them microelectrodes, and we'll say they're up to 1,000 microns. That can't possibly be a legitimate way to broaden the scope of what previously was a narrower application. Wouldn't you agree with that? In the abstract, I would agree with you. All right, now, what's different about this case from my hypothetical? Well, first of all, throughout the specification, all of the intrinsic evidence, and I'm referring for instance, starting with the reference to the plain meaning of the term microelectrode, the topic sentence of that third paragraph, the detailed description, as referring persons to the general understanding in the art, the fact that every reference to 100 microns or less, in connection with the width of electrodes, is clearly identified as preferred, as special, or typical. And then even the mix of planar and non-planar diffusion, and NOVA's experts' admission that electrodes of up to 1,000 microns would have a mix of planar and non-planar diffusion. And then there's teachings throughout the specification, and we list them at our Roche's Bluebrief, for instance, at pages 30 to 32. There's references throughout the specification that give broad teachings of varying the dimensions of the electrodes, including the width, of using larger dimension electrodes, of expanding the width. And clearly, in connection with the basic intrinsic evidence here, the term microelectrode, the claims are going to be limited to microelectrode, extends to the broadest scope of what a microelectrode could or should be, given the teaching, to a person of ordinary skill in the art, to various dimensions. Except for exhibits 3, 4, or 5, you can't point to any number bigger than 100. Other than through the plain meaning. That's correct. And that's a much harder case for you if exhibits 3, 4, and 5 are out. You have, again, the plain meaning, the Excalibur report, all of which is part of the intrinsic evidence that establishes that electrodes of up to 1,000 microns are microelectrodes. And then the mix of planar and non-planar diffusion language. But I agree, every limitation to 100 microns, albeit preferred or typical, is clearly not a limitation. I think we're going to have to leave it there. OK. Thank you, Mr. Judges. Now, I did not hear anything about the cross-appeal in Mr. Andrews' rebuttal. So I think there's nothing further to rebut. Unless you heard something. I didn't. No, you're off. OK, very well. Then we'll leave it there. The case is submitted. Thank you. We thank all panelists.